919 P.2d 1080

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Joe ROSS, Defendant–Appellant.**

**No. 22262.**

Supreme Court of New Mexico.

June 10, 1996.

Rehearing Denied June 10, 1996.

T. Glenn Ellington, Chief Public Defender, David Henderson, Assistant Appellate Defender, Santa Fe, for Appellant.

Tom Udall, Attorney General, Bill Primm, Assistant Attorney General, for Appellee.

## OPINION

MINZNER, Justice.

On motion by Defendant Joe Ross for rehearing or such other relief as the Court deems just and proper, the opinion filed on April 29, 1996 is withdrawn, and the following opinion is substituted in its place. The motion is otherwise denied.

Defendant Joe Ross appeals his convictions for the first degree murder and false imprisonment of his ex-wife, Connie Ross, contending that the trial court erroneously admitted into evidence four different statements made by her, in violation of the prohibition against hearsay and the Confrontation Clauses of the United States and New Mexico Constitutions. We conclude that the trial court erred in admitting one of the statements, but that the error was harmless. Accordingly, we affirm both convictions.

## I.  FACTS

Connie sustained what proved to be fatal gunshot injuries on Monday, August 23, 1993. She and Joe had been married and divorced twice. Their second divorce became final approximately one month prior to her death. At the time of her death they were living together. Joe testified at trial that up to the time of her death he had harbored hopes of a reconciliation. However, at the time of her death Connie was seeing someone else, a man named Larry Nail. The testimony at trial focused upon the events of August 23 and the preceding weekend.

Connie's sister, Judy Moya, testified that she and her family spent the night at the Ross residence on Saturday, August 21. Both Judy and Connie's son, Austin Schoonover, testified that they overheard Joe and Connie arguing in the master bedroom on Saturday evening. Judy testified that, during the course of this argument, she overheard Joe say something that sounded like "poom, poom, poom" and that Connie responded, "Joe, what are you doing, threatening me again? I'm going to get a restraining order on you, and you're going to get out of here sooner than you thought." Austin testified that he heard Connie say during that same argument, "I can't live like that." To this Joe responded, "You're not going to live at all."

On Sunday morning, Connie showed Judy a gun while the two were out of sight of the others. Connie told her sister that she had hidden the gun and that it belonged to Joe. Shortly thereafter, Judy and her family departed the Ross residence.

Austin testified at trial that he observed a pistol, covered by a towel, in Joe's back pocket on Sunday evening. Austin also recounted that Joe carried the gun in this manner to the store on Sunday evening and that he was sitting in the living room with the gun still in his pocket when Austin went to bed. Austin further testified that his mother gave him a handwritten note before he went to bed Sunday evening. The note stated that Joe was holding Connie hostage and instructed Austin to contact the police the following day. Austin also testified, however, that his mother returned to his room

later that evening and instructed him to disregard the note.

When Austin awoke the next morning, Joe was seated in the living room in the same chair he had occupied when Austin retired the night before. Austin testified that as he was leaving the residence to go to school, his mother called out to him, "Tell me 'bye. This is the last time you'll see me alive." Austin did not tell anyone about the note until the police contacted him after the shooting.

Monday was Connie's birthday, and she received at least four phone calls from well-wishers that morning. The first one, at about 7:30 a.m., was from her sister, Asucena Valdez. Connie's other sister, Judy, called twice that Monday morning, at 8:05 and again at 8:27. Connie's boyfriend, Larry, also called sometime around 8:00 a.m. Asucena, Judy, and Larry all became concerned about Connie's welfare as a result of these conversations, and all three of them testified at trial to statements that Connie made. The admissibility of their testimony and that of the note is at issue in this appeal.

Following his telephone conversation with Connie, Larry contacted the police and reported that Connie might be in danger. As a result, Officer Farmer of the Roswell Police Department drove to the Ross residence. He testified that no one responded when he rang the door bell and called out that he was a police officer. He then got back into his vehicle, drove a short distance from the house, and returned on foot. As he approached the residence the second time, he saw a man and a woman in the living room. He saw the woman walk rapidly towards a back bedroom. Officer Farmer again rang the door bell and called out, and again there was no response. He then summoned two additional officers, Montano and Hubbard, to the scene.

After the backup officers arrived, Officer Farmer walked to the rear of the mobile home, where he found an unsecured window. He called out that the police were going to enter the residence, that he knew that Connie was inside, and that she should come outside or come to the window. At that point Joe made himself visible to Officer

Farmer, called out that "everything was o.k.," and then ducked back out of sight. Officer Farmer demanded several times that Joe leave the residence, and he again said that everything was o.k. Officer Farmer then heard a woman call out faintly, "No, Joe, don't." At that point, Officers Montano and Hubbard began to kick in the door. As they were kicking the door, they heard four or five gunshots in rapid succession. The officers ceased their attempts to kick the door in, took cover, and summoned the SWAT team.

Several hours after the shots were fired, the police detonated a concussion grenade inside the residence, and the SWAT team entered. Inside they found Connie and Joe, both unconscious. Connie died eleven days later without regaining consciousness. The cause of her death was two .22 caliber bullet wounds to the back of the head. According to the testimony of the physician who conducted the autopsy, the gun that killed her was fired from a distance of one to eight inches from her skull.

Joe testified at trial. He testified that Connie told him Monday morning that she "wanted to die on her birthday." He further testified that he and Connie had spent Monday morning together and that when Officer Farmer arrived, they both agreed that they did not want to talk to the police. They therefore ignored Officer Farmer's knock. After the policeman returned a second time, Connie went to the back bedroom and he followed her. He testified that Connie grabbed the gun when the police began kicking at the door and that he struggled with her to prevent her from harming herself. As they struggled with the gun, it went off four or five times. He testified that he saw her fall and realized she had been shot and that he remembered nothing more from that point until he awakened in jail two days later.

Joe objected on hearsay grounds to the testimony of Asucena, Judy, and Larry and to the admission of the note. The trial court conducted a pretrial hearing on the admissibility of this evidence. The State asserted that one or more traditional hearsay exceptions applied to each of the disputed state-

ments. In addition, the State argued that all of the statements were admissible under SCRA 1986, 11–804(B)(5) (Supp.1995), the "catch-all" exception. Although it determined that each of these items of evidence was admissible, the court did not specify the precise bases for its rulings.

## II. HEARSAY ISSUES

■ We review the trial court's evidentiary rulings for an abuse of discretion. *See State v. Robinson*, 94 N.M. 693, 698, 616 P.2d 406, 411 (1980); *State v. Johnson*, 99 N.M. 682, 687, 662 P.2d 1349, 1354 (1983). As explained below, we conclude that the statement to Asucena was not hearsay and that the other disputed statements were admissible under the hearsay exception for statements of recent perception.

### A. Statement of Asucena Valdez

■ Asucena testified at trial that during their telephone conversation Connie told her that "it was the happiest day of her life because ... it was the day she was going to die." We conclude that this statement does not constitute hearsay.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." SCRA 1986, 11–801(C) (Repl.Pamp.1994). The purpose for which this evidence was offered is not readily apparent from the record;[1] however, we are satisfied that the State did not offer this statement in order to prove either of its assertions—that Connie was happy or that she would die that day. Thus, it was not hearsay. *See McCord v. Ashbaugh*, 67 N.M. 61, 64, 352 P.2d 641, 643 (1960); *Jim v. Budd*, 107 N.M. 489, 491, 760 P.2d 782, 784

(Ct.App.), *cert. denied*, 106 N.M. 95, 739 P.2d 509 (1987).

### B. Statements of Recent Perception

■ Austin testified that Connie gave him a handwritten note before he went to bed Sunday evening. The note said:

> Take this w/ you. When you go to school call the police & Tell them I'm being held hostage by Joe he has a loaded gun Tell them I'm going to die if They drive up cause he already told me. I love you.

Austin further testified that, some time later that evening, Connie returned to his bedroom and "told me everything was going o.k. and forget about it. Just not do anything about it unless she says." Judy testified that during the course of their telephone conversation on Monday morning, Connie stated that Joe had his gun with him and that it was loaded. When Judy asked if she should call the police, Connie responded, "Judy no; don't call the police. Joe already said that if the police come to the door, he's going to shoot me." Finally, Larry testified that when he telephoned, Connie sounded odd and seemed to feign talking to her sister Judy. Larry testified that Connie stated, "I can't even talk on the ... Joe, why are you holding me hostage? I can't even talk to my sister on the phone."

■ These statements all constituted hearsay because the State offered them to prove the matters asserted in the statements: (1) that Joe was holding Connie hostage; (2) that he had a loaded gun in his possession; and (3) that he had threatened to kill Connie if the police came.[2] We conclude, however, that each of these hearsay statements was admissible as a statement of recent perception under SCRA 1986, 11–804(B)(2) (Repl. Pamp.1994). This exception, which has been removed from our evidence rules since the

---

**1.** Joe does not argue on appeal that this evidence is irrelevant or that it was offered for an improper purpose. Thus we assume, without deciding, that this testimony was offered for a permissible purpose and that it was relevant to a material issue.

**2.** Note that this does not involve a "hearsay within hearsay" situation even though the declar-

ant—in this case Connie—was relating a statement made by another. *See* SCRA 1986, 11–805 (Repl.Pamp.1994). The State offered this statement to prove the truth of the matter asserted by Connie (i.e., that Joe made the statement). It did not offer this statement to prove the truth of the matter asserted in Joe's statement. *See* 2 John W. Strong, *McCormick on Evidence* § 324.1 (4th ed. 1992).

time of trial,[3] permits the introduction into evidence of a hearsay statement,

> not in response to the instigation of a person engaged in investigating, litigating or settling a claim, which narrates, describes or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which he was interested, and while his recollection was clear.

*Id.* Each of the statements at issue here "describe[d] or explain[ed] an event or condition recently perceived by the declarant." The events and conditions which the statements described or explained were those of (1) Connie being held hostage; (2) Joe possessing a gun; and (3) Joe threatening Connie. Moreover, this Court's decision in *State v. Martin,* 101 N.M. 595, 686 P.2d 937 (1984), supports application of this hearsay exception under these circumstances. In *Martin,* the defendant was charged with murdering her husband. *Id.* at 598, 686 P.2d at 940. Citing the exception for a statement of recent perception, the trial court permitted the victim's lover to testify, over a hearsay objection, that the victim had told the witness that the defendant had threatened to kill both the victim and the witness. *Id.* at 607, 686 P.2d at 949. On appeal, this Court upheld the trial court's ruling. *Id.; see also Robinson,* 94 N.M. at 698, 616 P.2d at 411; *State v. Maestas,* 92 N.M. 135, 142, 584 P.2d 182, 189 (Ct.App.1978).

Joe argues that none of Connie's hearsay statements is admissible under this exception because Connie intended to get a restraining order against Joe at the time she made the hearsay statements at issue. *See* SCRA 1986, 11–804(B)(2) (Repl.Pamp.1994) (exception does not apply to hearsay statements made "in contemplation of ... anticipated litigation"). Assuming that it was in fact Connie's intent to get a restraining order, the record does not support an inference that Connie made these statements in order to facilitate that process. Instead, the evidence indicates that Connie made all of the disput-ed statements out of concern for her own welfare. Connie did not initiate either of the two telephone conversations at issue. Judy testified that she telephoned in order to wish Connie a happy birthday. She further testified that Connie's disputed statements were in response to Judy's specific questions about whether Joe had a gun and whether she should call the police. Likewise, Larry testified that he telephoned because he intended to get together with Connie that day and because he was worried that he had not heard from her in several days. Connie herself initiated the note to Austin, but there is no basis in the record for the inference that she had any motive, other than her own survival, for doing so.

This case is thus quite different from *State v. Barela,* 97 N.M. 723, 643 P.2d 287 (Ct.App. 1982), the case upon which Joe relies. *Barela* involved a statement of identification made by the victim to a police investigator who had come to the hospital for the specific purpose of interviewing the victim about the crime. *Id.* at 725, 643 P.2d at 289. At the time of the interview, the police investigation had already focused upon the defendant. *Id.* The Court of Appeals held that the statement of identification that resulted from this interview was "in contemplation of litigation" and thus outside the purview of the statement of recent perception exception. *Id. Barela* is inapposite because in that case it was apparent that the police investigator procured the victim's hearsay statements for purposes of a criminal investigation and possible prosecution. Here there is no connection, apart from Joe's unsupported inference, between the disputed hearsay statements and any anticipated restraining order. We conclude that Joe's reliance upon *Barela* is misplaced.

Joe also points out that the statement of recent perception exception is not widely accepted, and New Mexico itself has abrogated it since the time of trial. It is true that this Court eliminated the exception from our hearsay rules effective January 1, 1995. *See* Order No. 94–8300 (N.M.Sup.Ct. Oct. 12,

---

**3.** An amendment, effective January 1, 1995, removed the statement of recent perception excep-tion from the rules of evidence.

1994). Nevertheless, the statement of recent perception exception was the law at the time of trial. Furthermore, the origins and policies of this somewhat obscure exception to the hearsay rule support its application in this case.

This Court first adopted the statement of recent perception exception in 1973, taking it verbatim from the rules of evidence that the United States Supreme Court had proposed in 1972. *See* Order (N.M.Sup.Ct. Apr. 26, 1973); *see also* 4 David W. Louisell & Christopher B. Mueller, *Federal Evidence* 971–72 (1980). That rule was in turn based upon Rule 63(4)(c) of the 1953 Uniform Rules of Evidence. *See* 4 Jack B. Weinstein et al., *Weinstein's Evidence* ¶ 804(b)(5)[04], at 804–201–02 (1995). Both Uniform Rule 63(4)(c) and Rule 804(B)(2) of the 1972 proposed federal rules applied to criminal as well as civil cases, *id.* at 804–202, and the intent of these rules was to address those situations in which the litigant was unable to establish a claim or defense because "the only witness with knowledge of what occurred [was] unavailable." *Id.* at 804–202. Professor McCormick hailed this new development in hearsay law as "an attempt to answer a need which many judges and writers have expressed for a wider use of declarations of persons deceased or otherwise unavailable." Charles T. McCormick, *Hearsay*, 10 Rutgers L.Rev. 620, 624 (1956). He observed that the new rule would "open the door to statements by victims of crime which can meet these conditions of trustworthiness, even though consciousness of impending death did not appear and hence they would not be eligible as dying declarations." *Id.*

Given this historical backdrop, we find that this case presents a situation in which application of the statement of recent perception exception is particularly appropriate. Joe took the stand at trial and gave his version of the events that occurred in the hours that preceded Connie's shooting. Only two people—Joe and Connie—had direct knowledge of many of the events that occurred during the critical time period. Without Connie's statements, the jury would have heard only Joe's version. We think that the framers of the 1953 Uniform Rules of Evidence contem-

plated similar situations when they developed Rule 63(4)(c).

### III. THE CONFRONTATION ISSUE

■ As his second ground for appeal, Joe asserts that the trial court's admission into evidence of Connie's hearsay statements violated his right of confrontation. *See* U.S. Const. amend. VI; N.M. Const. art. II, § 14. Joe's constitutional argument relies primarily upon *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). The issue of whether admission of hearsay evidence violates a defendant's rights under the Confrontation Clause is a question of law. We therefore apply a de novo standard of review. *State v. Ruiz*, 120 N.M. 534, 536, 903 P.2d 845, 847 (Ct.App.), *cert. denied*, 120 N.M. 498, 903 P.2d 240 (1995).

#### A. Preservation

■ We consider as a preliminary matter whether Joe's counsel preserved the confrontation issue for appellate review. The record indicates that counsel timely objected to each of the disputed statements on evidentiary grounds and that he also protested that "[t]o allow [the hearsay] statements to be introduced would violate not only the Constitution of the State of New Mexico but also the Constitution of United States" and would "violate the defendant's ... rights to due process." Counsel interposed these objections during a pretrial hearing, and he renewed them when the State sought to introduce each of the disputed hearsay statements. Joe's counsel did not, however, specifically mention the right of confrontation, the Sixth Amendment, or Article II, Section 14 of the New Mexico Constitution. The State, relying on *State v. Lucero*, 104 N.M. 587, 725 P.2d 266 (Ct.App.1986), asserts that these objections were not specific enough to preserve the confrontation issue.

■ The Confrontation Clause of the Sixth Amendment is made applicable to the states through the Fourteenth Amendment's Due Process Clause. *Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965). The right of confrontation is thus one of the elements of "due process of law" that the Fourteenth Amendment se-

cures for criminal defendants in state court proceedings. Here, counsel invoked the United States Constitution and "due process" along with his evidentiary objections. The evidentiary rule against hearsay and the constitutional right of confrontation are intended to protect similar interests, and the two doctrines are intricately related. *See White v. Illinois,* 502 U.S. 346, 352–53, 112 S.Ct. 736, 740–41, 116 L.Ed.2d 848 (1992); *Barela,* 97 N.M. at 726–27, 643 P.2d at 290–91; *State v. Pacheco,* 110 N.M. 599, 603, 798 P.2d 200, 204 (Ct.App.), *cert. denied,* 110 N.M. 533, 797 P.2d 983 (1990). Thus, "[a] discussion of the constitutional problems of hearsay must focus primarily on the Confrontation Clause of the Sixth Amendment." 2 Strong, · *supra,* § 252, at 124. While acknowledging that counsel's objection might have been more specific, we think it was adequate to bring to the attention of the trial court the claim that the evidence would violate Joe's rights under the Confrontation Clause. *See State v. Lopez,* 105 N.M. 538, 546, 734 P.2d 778, 786 (Ct.App.1986), *cert. denied,* 479 U.S. 1092, 107 S.Ct. 1305, 94 L.Ed.2d 160, *and cert. quashed,* 105 N.M. 521, 734 P.2d 761 (1987). Furthermore, we find that the present case differs from *Lucero,* because the defendant in that case made only an evidentiary objection to hearsay evidence without ever suggesting that its admission would violate either the state or federal constitutions. 104 N.M. at 590, 725 P.2d at 269. We next turn to the merits of Joe's confrontation claim.

### B. Idaho v. Wright

In *Wright,* the United States Supreme Court considered the circumstances under which the admission of an unavailable declarant's hearsay statements violates the defendant's constitutional right of confrontation. *Wright* involved a child molestation prosecution in which the trial court admitted statements made by a 2½-year-old victim to an examining physician. 497 U.S. at 810–11, 110 S.Ct. at 3143–44. The child was not available to testify and be cross-examined at trial, and her statement did not fit into any of the traditional enumerated exceptions to the hearsay rule. The United States Supreme Court held that the trial court had violated the defendant's constitutional rights when it

admitted this evidence pursuant to Idaho's residual or "catch-all" exception to the hearsay rule. *Id.* at 826–27, 110 S.Ct. at 3152–53.

The *Wright* Court said that the Confrontation Clause permits admission of a non-available declarant's hearsay statement if it falls within a "firmly rooted exception" to the hearsay rule. *Id.* at 815, 110 S.Ct. at 3146–47 (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)). If the disputed statement does not fall within a firmly rooted hearsay exception, then there must be "particularized guarantees of trustworthiness" equivalent to those associated with a firmly rooted exception. *Id.* In evaluating whether adequate guarantees of trustworthiness exist, a court may not look to evidence that corroborates the veracity of the statement. Rather, the court must consider the totality of the circumstances surrounding the making of the statement and determine whether the declarant was so likely to be telling the truth that cross-examination of the declarant "would be of marginal utility." *Id.* at 820, 110 S.Ct. at 3149; *cf. Barela,* 97 N.M. at 726, 643 P.2d at 290 (recognizing that the reliability of a hearsay statement should rest upon more than corroboration).

### C. Is the Statement of Recent Perception Firmly Rooted?

Our first task under *Wright,* then, is to determine whether the statement of recent perception exception is a "firmly rooted" hearsay exception. In *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), the United States Supreme Court considered whether the co-conspirator exception to the hearsay rule was "firmly rooted." The Court said:

We think that the co-conspirator exception to the hearsay rule is firmly enough rooted in our jurisprudence that, under this Court's holding in *Roberts,* a court need not independently inquire into the reliability of such statements. The admissibility of co-conspirators' statements was first established in this Court over a century and a half ago ... and the Court has repeatedly reaffirmed the exception as accepted practice. In fact, two of the most promi-

nent approvals of the rule came in cases that petitioner maintains are still vital today. To the extent that these cases have not been superseded by the Federal Rules of Evidence, they demonstrate that the co-conspirator exception to the hearsay rule is steeped in our jurisprudence.

*Id.* at 183, 107 S.Ct. at 2782–83 (citations omitted). This passage indicates that a court should consider the exception's historical longevity and widespread acceptance to determine whether the exception is "firmly rooted."

The statement of recent perception exception is not a common law hearsay exception. *See* 4 Weinstein, *supra,* ¶ 804(b)(5)[04], at 804–201–05. Moreover, it has been a part of New Mexico evidence law only since 1973.[4] Apart from New Mexico, only three states, Hawaii, Wyoming, and Wisconsin, have adopted this exception. *See* Haw.Rev.Stat. R.Evid. 804(b)(5) (1993); Wis.Stat.Ann. § 908.045(2) (West 1993); Wyo.Stat.R.Evid. 804(b)(5) (1978). Wyoming restricts application of this exception to civil cases; thus, only New Mexico, Wisconsin, and Hawaii permit its use in criminal cases. Given the history and very limited acceptance of the statement of recent perception exception, we cannot characterize it as "firmly rooted." *See* Richard A. Gonzales & Nikki J. Mann, *Evidence,* 17 N.M.L.Rev. 271, 285 (1987).

### D. Guarantees of Trustworthiness

Because the statement of recent perception exception is not firmly rooted, these hearsay statements were admissible only if they were supported by particularized guarantees of trustworthiness. In determining whether such guarantees existed, we must analyze the circumstances surrounding the making of each of these statements. Bearing in mind that traditional hearsay exceptions are predicated upon the notion that people are likely to tell the truth in certain situations, *see Barela,* 97 N.M. at 726, 643 P.2d at 290, we consider whether each of the statements was accompanied by indicia of reliability equivalent to those upon which the traditional exceptions rely. *See Wright,* 497 U.S. at 819–20, 110 S.Ct. at 3148–49; *cf. Pacheco,* 110 N.M. at 602, 798 P.2d at 203 (reasoning that indicia of reliability necessary for admission under one of the two catch-all exceptions should be equivalent to those exceptions preceding that exception). Our analysis focuses exclusively upon the circumstances surrounding the making of the out-of-court statement, disregarding other evidence that might corroborate the statement's veracity. *Wright,* 497 U.S. at 820–21, 110 S.Ct. at 3149–50; *Pacheco,* 110 N.M. at 602–03, 798 P.2d at 203–04.

In a recent case in which we evaluated the trustworthiness of a hearsay statement, this Court considered four factors leading to unreliability: (1) ambiguity; (2) lack of candor; (3) faulty memory; and (4) misperception. *See State v. Williams,* 117 N.M. 551, 560–61, 874 P.2d 12, 21–22 (1994). We will consider each of Connie's three hearsay statements in light of these four factors.

#### 1. The Note

■ Because this communication was written and the original writing was produced at trial, one of the dangers of unreliability (ambiguity) is of little concern. Likewise, there is little danger that Connie suffered from a faulty memory at the time she wrote the note. These were matters of grave importance that had just occurred or were ongoing when the note was written. Our analysis therefore focuses upon those factors that might have led Connie to the mistaken conclusion that she was being held hostage (misperception) or that might have

---

**4.** New Mexico took the statement of recent perception exception from the rule proposed by the United States Supreme Court in 1972. *See* 4 Weinstein, *supra,* at ¶ 804(b)(5)[04], at 804–201, 206. That proposed rule was rejected by Congress the following year; thus, the Federal Rules of Evidence do not include such a hearsay exception. A report from the House of Representatives Committee on the Judiciary indicates the basis for Congress's rejection of proposed Rule 804(B)(2): "The Committee eliminated this Rule as creating a new and unwarranted hearsay exception of great potential breadth. The Committee did not believe that statements of the type referred to bore sufficient guarantees of trustworthiness to justify admissibility." 4 Weinstein, *supra,* at 804–13 (quoting H.R.Rep. No. 93–650, at 6, 93d Cong., 1st Sess. (1973)).

induced Connie [5] to lie (lack of candor).

We note first that there is nothing in the record to give rise to an inference that Connie mistakenly believed that Joe was holding her hostage. In view of the fact that Connie and Joe had been married and lived together for several years, we can only presume that she was quite familiar with his personality. Accordingly, the probability of such a mistake is remote.

In considering the issue of Connie's candor, we are struck by the probability that a note of this nature would lead to a grave confrontation with the police. Had Austin actually delivered this note to the police, it seems unlikely that the police would have simply disregarded it. It also seems unlikely that they would have sent an officer to the residence to conduct a routine investigation, since to do so might precipitate Connie's death. Rather, the police would likely have responded to a note of this sort as they would react to any other hostage situation—by deploying the SWAT team or surrounding the residence with sharpshooters. We can only assume that Connie also anticipated such consequences when she wrote the note, and we think it is unlikely that she would have been willing to provoke a serious police confrontation of this sort, with its attendant risks to herself and her loved ones, unless she actually believed herself to be a hostage.

The fact that it is a crime to make a false report of criminal activity is also significant here. Had the note's contents been false, then delivery of the note to police would have subjected Connie to criminal liability. *See* NMSA 1978, § 30–39–1 (Repl.Pamp.1989).

■ Joe argues that the note lacks the requisite guarantees of trustworthiness because Connie recanted it. We recognize that a declarant's recantation of a hearsay statement detracts greatly from its trustworthiness. *See State v. Triplett*, 316 N.C. 1, 340 S.E.2d 736, 742 (1986). Here, however, Connie did not recant any of the three assertions in the note; she merely instructed Austin not

to deliver it. According to Austin's testimony, she told him that "everything was going o.k." and to "not do anything unless she says." This evidence does not indicate that Connie acknowledged that the contents of the note were false. Rather, it only indicates that, as may often occur during domestic violence, something happened that gave her hope she could work things out on her own without summoning the police. Connie's instruction to "not do anything unless she says" indicates that she recognized that it might be necessary to send Austin for help at some future time. It could be inferred from these facts that Connie no longer believed herself to be a hostage when she returned to Austin's room the second time. However, there is little basis for the inference that Connie did not believe herself to be a hostage at the time that she wrote and delivered the note.

Joe also asserts that Connie's intention to get a restraining order gave her an incentive to falsely claim that she was being held hostage. Assuming that Connie did intend to apply for a restraining order, we do not agree that such an intent would induce a person in her position to falsely represent that she was a hostage. A court would very likely learn of the report's falsity and discount its originator's credibility, and thus there is little chance that such a ruse would accomplish the desired result. We think it is unlikely that the desire for a restraining order would induce a rational person to risk criminal liability and a dangerous police confrontation by making a false report that would have little prospect of achieving its intended effect.

We conclude that particularized guarantees of trustworthiness accompanied the making of the hearsay statements in the note. Therefore, the trial court properly admitted it into evidence.

### 2. The Statement to Judy

■ We think that Connie's statements to Judy—that Joe had a loaded gun and that

---

5. Note that we are not concerned here about whether Austin was telling the truth when he testified that Connie had written the note. Austin testified at trial and was subject to cross-examination. *See Williams*, 117 N.M. at 561,

874 P.2d at 22 (noting that "[t]he test under the catch-all rules is whether the out-of-court statement—not the witness's testimony—[must have] circumstantial guarantees of trustworthiness."); *Barela*, 97 N.M. at 726, 643 P.2d at 290 (same).

he had vowed to shoot her if the police came—also bore particularized guarantees of trustworthiness.

First, there is very little danger that Connie was mistaken about whether Joe had a gun or whether he had threatened her. Joe and Connie lived together as husband and wife for an extended period of time. It is probable that Connie had personal knowledge of any guns in Joe's possession. Likewise, it is unlikely that Connie misperceived the threat. A statement of intent to shoot someone if the police arrive is not the sort of statement that is susceptible to nuance or subtlety.

The danger of ambiguity, i.e., that Judy misunderstood Connie, was also minimal. Connie's statements were in response to Judy's specific questions about whether Joe had a gun and whether Judy should call the police. Furthermore, Connie and Judy were sisters, and there was evidence at trial that they were quite close and talked on the telephone frequently. Indeed, Judy had spent the weekend prior to the shooting as a guest in Connie's home. We think that there is little danger that Judy misunderstood Connie's statements.

The closeness of the relationship between Connie and Judy is also relevant to the issue of Connie's candor. Judy testified that she was "scared" about her sister's welfare and that this was her reason for calling Connie on the morning of August 23. Judy further testified that she began to cry as she talked to Connie. Thus, Connie apparently realized that Judy was upset about Connie's situation; nevertheless, Connie aggravated Judy's anguish by recounting Joe's threat and reporting that he had a loaded gun. We think it unlikely that Connie, who was on close, loving terms with her sister, would burden her with statements of this nature unless they were true. The psychological incentive to tell the truth under these circumstances is equivalent to the psychological incentives for truthfulness upon which the traditional hearsay exceptions rest. *Cf. Wright,* 497 U.S. at 820, 110 S.Ct. at 3149 (recognizing that the rationale for traditional hearsay exceptions is that declarants are likely to be truthful in certain situations); *Pacheco,* 110 N.M. at 602,

798 P.2d at 203 (observing that a hearsay statement is reliable if "the circumstances in which the [statement is] made are indicative of a strong propensity for truthfulness"). We conclude that Connie's statements to Judy possessed the requisite particularized guarantees of trustworthiness and that they were properly admitted into evidence.

### 3. The Statements to Larry

■ We cannot say that this hearsay statement ("Joe, why are you holding me hostage?") was made under circumstances evincing particularized guarantees of trustworthiness. First, it is possible that Connie only meant to use the term "hostage" figuratively, rather than literally. *See Williams,* 117 N.M. at 560, 874 P.2d at 21 (describing the danger of ambiguity). Also, this situation lacked the sort of specific incentives to tell the truth that accompanied the other two disputed hearsay statements. *See id.* (describing danger of lack of candor). We therefore conclude that the trial court admitted this hearsay in violation of Joe's Sixth Amendment right of confrontation. We next consider whether this error was harmless. *See Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986) (holding that Confrontation Clause violations are subject to harmless error analysis).

■ In *Williams,* this Court recently held that the admission of inadmissible evidence into a criminal trial will be considered harmless if there is:

(1) substantial evidence to support the conviction without reference to the improperly admitted evidence, (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear so minuscule that it could not have contributed to the conviction, and (3) no substantial conflicting evidence to discredit the State's testimony.

117 N.M. at 559, 874 P.2d at 20 (quoting *State v. Moore,* 94 N.M. 503, 504, 612 P.2d 1314, 1315 (1980)).

■ A conviction is supported by substantial evidence if "evidence of either a direct or circumstantial nature exists to sup-

port a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). There was an abundance of evidence to support Joe's convictions for first degree murder and false imprisonment, and there is no need to recount it here.

We also find that the admissible evidence of guilt was so disproportionate to the inadmissible evidence that the inadmissible evidence could not have contributed to Joe's conviction. Here, the inadmissible evidence consisted of Larry's testimony that he had heard Connie say "Joe, why are you holding me hostage?" This testimony was cumulative of at least two other items of properly-admitted evidence wherein Connie stated that Joe was holding her hostage. Furthermore, Connie's assertion that Joe was holding her against her will by the threat of violence was well corroborated by other evidence at trial. That corroboration included (1) Austin's testimony that Joe carried a gun in his pocket for an extended period of time during the evening preceding the shooting; (2) Austin's testimony that Joe stated "You're not going to live at all"; (3) Judy's testimony that she heard Joe say something that sounded like "poom, poom, poom;" and (4) the timing of the gunshots and the nature of the wounds. *See Wright*, 497 U.S. at 823, 110 S.Ct. at 3150–51 (observing that evidence tending to corroborate improperly admitted hearsay is relevant to a harmless error analysis).

Finally, we believe that this case meets the third requirement for a finding of harmless error because Joe failed to offer "substantial conflicting evidence to discredit the State's testimony." *Williams*, 117 N.M. at 559, 874 P.2d at 20. Joe himself was the single defense witness. He testified that Connie was attempting to commit suicide and that he was struggling with her for control of the gun when she received her fatal injuries. In view of the nature of those injuries—two gunshot wounds to the back of the head—we conclude that the trial's outcome would have been the same even if the trial court had not erroneously admitted Connie's hearsay statement to Larry. Accordingly, this error was harmless.

## IV. CONCLUSION

The trial court properly admitted into evidence the hearsay statements that Connie made in the note and in her telephone conversation with Judy. The trial court violated Joe's Sixth Amendment right of confrontation when it admitted into evidence the hearsay statement that Connie made to Larry. However, that error was harmless. The convictions for first degree murder and false imprisonment are affirmed.

**IT IS SO ORDERED.**

BACA and FRANCHINI, JJ., concur.