79 P.3d 1263

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Danny H. HAILI, Defendant–Appellant.**

No. 24059.

Supreme Court of Hawai'i.

Dec. 3, 2003.

92

Samuel P. King, Jr., Honolulu, on the briefs, for defendant-appellant.

Bryan K. Sano, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ. with ACOBA, J., concurring separately and dissenting.

1. HRS § 707–701.5 provides:

 **Murder in the second degree.** (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person. (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

2. HRS § 706–656 provides:

 **Terms of imprisonment for first and second degree murder and attempted first and second degree murder.** (1) Persons convicted of first degree murder or first degree attempted murder shall be sentenced to life imprisonment without possibility of parole.

 As part of such sentence the court shall order the director of public safety and the Hawai'i paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

 (2) Except as provided in section 706–657, pertaining to enhanced sentence for second degree murder, persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by. the Hawai'i paroling authority; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

Opinion of the Court by DUFFY, J.

Defendant-appellant Danny Haili (Danny) appeals from the judgment of the first circuit court, the Honorable Karen Ahn presiding, convicting him of and sentencing him for the offense of murder in the second degree in violation of Hawai'i Revised Statutes (HRS) §§ 707–701.5(1) (1993),[1] 706–656 (1993 & Supp.2002),[2] and 706–660.1(1)(a) (1993).[3]

On June 1, 1996, at approximately 10:00 p.m., Danny shot and killed his wife, Philimena Haili (Philimena). The prosecution argued that Danny was guilty of second degree murder rather than manslaughter: the prosecution presented the jury with witnesses to the shooting, as well as witnesses to Danny's and Philimena's actions before the shooting, to establish that Danny had the requisite state of mind (and was not under the influence of an extreme mental or emotional disturbance) to justify a conviction of second

If the court imposes a sentence of life imprisonment without possibility of parole pursuant to section 706–657, as part of that sentence, the court shall order the director of public safety and the Hawai'i paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

This was the version of section 706–656 in effect as of June 1, 1996 (the day the alleged murder took place); the 1996 amendments to section 706–656 took effect upon their approval on April 22, 1996. 1996 Haw. Sess. Laws c. 15 § 1.

3. The complaint actually cites HRS § 706–660.1(a), but the correct citation was likely intended to be HRS § 706–660.1(1)(a) HRS § 706–660.1 provides in relevant part:

 **Sentence of imprisonment for use of a firearm, semiautomatic firearm, or automatic firearm in a felony.** (1) A person convicted of a felony, where the person had a firearm in the person's possession or threatened its use or used the firearm while engaged in the commission of the felony, whether the firearm was loaded or not, and whether operable or not, may in addition to the indeterminate term of imprisonment provided for the grade of offense be sentenced to a mandatory minimum term of imprisonment without possibility of parole or probation the length of which shall be as follows:

 (a) For murder in the second degree and attempted murder in the second degree—up to fifteen years. . . .

degree murder. Danny argued that he suffered from an extreme mental or emotional disturbance (EMED), thereby warranting conviction of the mitigated offense of manslaughter.

On appeal, Danny raises the following points of error: (1) the circuit court erred in admitting hearsay testimony by five different witnesses, thereby violating, *inter alia,* his constitutional right to confront adverse witnesses; (2) the circuit court erred in refusing to further examine a juror after the close of evidence when the parties learned that she was the wife of a former deputy prosecutor; (3) the circuit court erred in improperly instructing the jury regarding the mitigating defense of EMED manslaughter and in refusing to define the term "extreme mental or emotional disturbance" in response to a jury communication asking the court to define the term; and (4) the circuit court erred in admitting testimony showing that two shotguns and one handgun were found in Danny's bedroom, even though none of these guns was used in the commission of the instant offense. We agree with Danny's first point of error: he was denied his constitutional right to confront adverse witnesses, and this error was not harmless beyond a reasonable doubt. We therefore vacate his conviction and remand for a new trial.[4]

## I. BACKGROUND

### A. *Factual Background*

The Hailis' next-door neighbor, Bruce Thomas, testified that he and his older daughter were outside on the lānai[5] at approximately 10:00 p.m. on June 1, 1996. Thomas heard a "thump or a door slam," then heard Danny's oldest daughter, Nani, scream, "No, daddy." Thomas heard the Hailis' front door swing open and slam shut and thereafter heard a series of gun shots. Thomas testified that he heard at least three or four gun shots "just one after another,

just bang-bang-bang-bang." Thomas and his daughter immediately went inside their house, where he called 911. Several minutes later, he heard a second series of shots; he remembered at least three shots in the second series, but did not count the exact number. On cross-examination, Thomas testified that he never saw Danny physically abuse Philimena and that Philimena never complained about Danny. However, on redirect examination, he testified that he did not have the type of relationship with Philimena where she would confide in him.

In June 1996, Eben Wong, Jr. (Eben) lived with his parents, whose home was located two doors away from the Hailis. On the evening of June 1, he was having dinner at the home of another neighbor, Jody Wong (Jody) (no relation to Eben). Eben testified that, at approximately 9:00 p.m., he heard a series of gunshots: he first heard four shots, then heard two more approximately ten seconds later. Eben walked up into the cul de sac area, where he saw that the Hailis' garage light was on. He saw Philimena lying on the ground in between the two cars in the garage, and saw Danny make his way over to where Philimena was. He saw Danny stand over Philimena and say, "[D]on't fuck with me." Eben testified that Danny said something else and then said, "I told you, don't fuck with me." Eben also testified that he thought he heard a response from Philimena. According to Eben, Danny looked out in Eben's direction, after which Danny "spun around" and turned off the garage light. Danny went back to the same area in which he was standing before turning off the light; he stood above Philimena, very close to her, and shot her several more times. Eben quickly walked to his parents' house and tried calling Jody, but her number was busy. Eben heard a few more gunshots; he walked back down to Jody's house where he learned that they had called the police. Jody testified that she heard about four or five shots,

---

4. Danny also raises a fifth point of error: he argues that the cumulative effect of the other four errors results in reversible error, even if any single error is not reversibly erroneous. However, because we vacate Danny's conviction and remand for a new trial, this point of error is moot.

5. "Lānai" means "[p]orch, veranda; temporary open-sided roofed structure near a house." M.K. Pukui & S.H. Elbert, *New Pocket Hawaiian Dictionary* 77 (rev. ed.1992).

then heard another four or five shots approximately five minutes later.

Danie Nohonani Haili (Nani), the Hailis' adult daughter, was at the Hailis' residence the night of June 1, 1996. At approximately 10:00 p.m., Nani heard her mother yelling for Nani's grandfather (Philimena's father). Nani saw her mother running through the house; she testified that Philimena was "frantic." Danny was following Philimena, and Nani thought that Danny and Philimena were arguing. Nani went through the house to the garage and saw Danny in the garage with the gun in his hand. By the time Nani got to the garage, Danny had already shot Philimena twice; Danny was standing "right next to [Philimena]," and the gun went off again. Nani ran out of the house, and heard the gun go off five or six more times on her way out of the house. At some point after that night, Danny told Nani that he shot Philimena "because she was leaving him."

Richard Ching, Philimena's stepfather, testified at a preliminary hearing but died before Danny's first trial.[6] His testimony from the preliminary hearing was read to the jury at Danny's second trial. Ching testified that he was in the kitchen having supper at approximately 10:00 p.m. when Philimena, Danny, and Nani rushed past him. They went through the kitchen through the carport, at which point Ching heard a series of gunshots. After the gunshots, Danny came back into the house. Ching testified that he did not know where Danny went, but that after approximately five minutes Danny came back out again and went through the kitchen door. Ching then heard approximately four or five more gunshots. On cross-examination, Ching stated that he did not see a gun in Danny's hands as Danny rushed by him.

Honolulu Police Department (HPD) Officers Spencer Parker (Officer Parker), Miles Jung (Officer Jung), Andre Carreira (Officer Carreira), and Brett Carter (Officer Carter) responded to the scene. The four officers approached the Hailis' residence together.

As the officers walked up to the Hailis' residence, Officer Jung heard a male's voice saying, "[O]ver here." The officers looked and saw Danny seated in the lānai area at a table in front of a window at the Hailis' residence; as the officers approached him, Officer Jung noticed a gun on the table and grabbed the gun immediately. Officer Jung asked Danny what had happened, and Danny said that he was involved in a domestic with his wife. Danny said that his wife was over by the garage; Officer Jung put Danny's gun in his car to secure it,[7] then went to the garage and discovered Philimena's body. Officer Parker placed Danny under arrest and asked him a number of questions; Officer Parker testified that Danny answered calmly and coherently and that Danny did not appear to be extremely emotionally disturbed. Officer Parker testified that "[Danny] uttered to me that he was involved in a domestic, he found out his wife was having an affair, and that he felt bad." Officer Parker testified that Danny did not appear to be in shock.

HPD Officer Kelly Mahi (Officer Mahi) arrived at the scene after the other officers. Officer Mahi put manila envelopes over Danny's hands to preserve evidence; she testified that, as she was doing this, Danny said, "She made me so mad." She testified that Danny was calm, did not struggle with the police officers, and appeared to be oriented in time and place. Officer Jung also testified that Danny appeared to be oriented in time and space and did not appear to be confused or disturbed. He also testified that he did not observe Danny crying, shaking, or trembling.

Mary Wagner, an evidence specialist with HPD at the time of the shooting, arrived at the Hailis' residence at approximately 11:55 p.m. on June 1, 1996. She photographed a gun on the table in the lānai area to the right of the driveway in front of the Hailis' resi-

6. As discussed in the Procedural Background section *infra*, Danny was first tried in 1998; the circuit court declared a mistrial because the jury was unable to reach a unanimous verdict.

7. Sergeant Takahashi, Officer Jung's supervisor, arrived a few minutes after the officers had secured the scene. Sergeant Takahashi instructed Officer Jung to place the gun back at the scene where he had found it.

dence.[8] Wagner also photographed a semi-automatic handgun discovered between the mattresses of the bed in the master bedroom and two shotguns from the closet in the master bedroom. That particular closet contained male clothing, whereas another closet in the bedroom contained female clothing. Defense counsel made a timely objection to the introduction of this evidence.

Wagner testified that the shooting appeared to have been focused on Philimena. Wagner testified that two cars in the driveway had been damaged slightly by bullets: a white Lincoln Town Car in the driveway was struck by one bullet at an angle, and a blue pick-up truck in the driveway was struck by a bullet in the front passenger-side tire. Wagner also testified that, other than damage from one bullet to each of the two cars in the driveway (two bullets total), there was no damage from bullets or bullet fragments to the carport ceiling, or to the car windows, or to other portions of the house. Wagner processed Danny at the Kailua Police Station; she testified that, while at the Station, Danny appeared to be oriented as to what was happening and did not appear distraught. She testified that he appeared calm and did not appear confused as to what was happening.

Wagner also testified that many of Philimena's bullet wounds came from a gun fired at close range. Wagner testified that one of Philimena's bullet wounds, on the upper left side of her back, had powder and soot marks around the bullet hole, indicating that the bullet was fired from very close range. She also testified that a bullet wound in Philimena's left forearm was from a bullet fired at a relatively close range. There was also a black mark close to the bullet wound in Philimena's middle finger, indicating "that either her hand may have been around the barrel or in front of it, but at very close range to the muzzle at the time that the bullet was fired." Wagner testified that there were no apparent injuries to Philimena's legs or lower body, other than one bullet that appeared to graze across Philimena's left knee.

Dana Shinozuka, an evidence specialist with HPD, also responded to the Hailis' residence. He recovered and packaged the gun that Wagner photographed on the table in the lānai area. He testified that the gun was loaded: the gun had one live cartridge and four cartridge cases inside.

Curtis Kubo, a criminalist with HPD, testified as an expert witness in firearms and ammunition. He testified that the handgun recovered by Shinozuka was a six-round revolver and that, for this type of gun, each round had to be loaded individually. On cross-examination, Kubo testified that after a gun has been fired, the hammer of the gun will rest on top of that spent round. However, Kubo testified that when the gun was recovered the hammer of the gun was sitting on top of a live round. Kubo explained that the hammer could be on top of a live round because a person pulled the hammer back, cocked the gun, but then released the hammer slowly without firing the gun.

Bani Win, M.D. (Dr. Win), deputy medical examiner for the City and County of Honolulu, testified as an expert in forensic pathology. On June 3, 1996, Dr. Win performed an autopsy on Philimena. She testified that Philimena died from multiple internal injuries due to gunshot wounds. She testified that Philimena had approximately twelve gunshot wounds to the body, including four wounds to her chest cavity. Dr. Win believed that a minimum of eleven bullets struck Philimena. One gunshot entered from the rear of Philimena's body and one entered from the side; the rest entered from the front of her body. She could not determine the order in which the wounds were inflicted. Dr. Win testified that two of the wounds—to Philimena's left finger and left arm—were "defensive injuries," i.e., injuries to the extremities that occurred when Philimena tried to defend herself by raising her arm or hand.

HPD Detective Larry Tamashiro (Detective Tamashiro) testified that he met with Danny at the Kailua Police Station at 2:05 a.m. on June 2, 1996. Detective Tamashiro obtained Danny's written permission to

---

8. This appears to be the same gun that Officer Jung had secured in his car and then placed back at the scene at the instruction of Sergeant Takahashi.

search the interior of the Hailis' residence. Detective Tamashiro testified that Danny appeared able to comprehend what was happening and that Danny was not shaking, crying, or trembling at the time. He also testified that Danny did not "appreciably" appear to be under the influence of alcohol. However, Detective Tamashiro testified that Danny was arrested at 10:05 p.m.; Danny was tested for alcohol at 10:47 p.m., at which time his blood alcohol reading was .031.

Lenora Kaonohi worked with Philimena at Safeway in Kailua. Kaonohi testified that, four months prior to Philimena's death, Philimena told Kaonohi that Danny had threatened to kill her (Philimena). For several days in a row, Philimena told her that Danny had said that he was going to kill her. Philimena told Kaonohi that she and Danny went to dinner at Fisherman's Wharf and that Philimena told Danny she wanted a divorce. According to Kaonohi's testimony of her conversation with Philimena, Danny would not give Philimena a divorce but would allow her to continue to see Ronald Akina (whose relationship with Philimena and Danny is explained more fully *infra*). Kaonohi testified that Philimena said that Danny had threatened to kill her if she left him. Kaonohi testified that Philimena was scared of Danny, but after a while just became resigned to the fear. On cross-examination, Kaonohi testified that she specifically asked Philimena whether there was physical abuse in the marriage and that Philimena said there was none.

Jody Wong testified that the Hailis were a private couple and that Philimena and Danny had a "[g]ood, healthy relationship." Jody testified that Danny was jealous of his wife; although Philimena was a "conservative" dresser, Jody would hear Danny tell Philimena that her pants were too tight or that something was too low and she needed to button up. She testified that Danny and Philimena were "always together" and that Philimena had no free time apart from Danny.

Bernadette Lavea, a good friend of Philimena's, testified at Danny's first trial. By the time of the second trial, Lavea had died. A portion of Lavea's testimony from the first trial was read to the jury in the second trial; her testimony therefore became part of the evidence in the case. Lavea knew Philimena from 1985 until Philimena died in 1996. Lavea testified that she drove Philimena and a few other people to the airport for a trip to Las Vegas on January 25, 1996. When meeting on the morning of the 25th, Philimena told Lavea that she (Philimena) almost did not take the trip to Las Vegas because of what had happened between Philimena and Danny the night before. Philimena told Lavea "[t]hat they got into an argument and Danny whacked her three times on the head, pulled her arm to the wall, threw her into the wall"; Lavea testified that Philimena said she hated Danny. Philimena also told Lavea that she told Danny she wanted a divorce. Lavea testified that Philimena told her that, after informing Danny she wanted a divorce, Danny grabbed her, pointed a gun at her head, and threatened to kill her. On cross-examination, Lavea testified that she did not see any bruises or indications that Philimena had been hit.

Philimena's half-sister, Mary Pasco, also testified at Danny's first trial and died before the second trial. Pasco's testimony from the first trial was read to the second jury and became part of the evidence in the case. Pasco testified that she saw Philimena on Maui in late March 1996. Philimena told Pasco that she and Danny were getting into fights, and Philimena showed Pasco a bruise on her forehead. Pasco testified that Philimena's bruise was "straight across over the forehead." Philimena also showed Pasco other bruises, including a bruise on her shoulder that Pasco testified was "big enough for me to see that it looked almost like a fist" and bruises on her arm that Philimena said were finger marks. Pasco did not see the bruises before Philimena showed them to her because Philimena had covered the bruises with clothing. Philimena told Pasco that Danny caused the bruises to her head with his fist and knuckles, to her shoulders with his knees, and to her arms with his hands. Pasco also testified that Philimena told her that she (Philimena) was planning to leave Danny.

Dayna Haili (Dayna), the Hailis' younger daughter, testified that her parents' relationship was "very good." She also testified that her father had about five guns. Dayna admitted making a statement to Detective Tamashiro five days after Philimena was shot; Dayna testified that she told Detective Tamashiro that when her mother went to Maui, Dayna thought she saw a gun underneath Danny's shirt. Dayna testified that she questioned her father about where he was going and that Danny said he was "taking care of business." Dayna also testified that she was on drugs and alcohol at the time of her interview with Detective Tamashiro and that her impressions and statements to the Detective may have been incorrect.

Carolyn Chong knew Philimena for eight years before she was killed. Chong testified that on March 23 or 24, 1996, she had a birthday party for her one-year-old son at Captain's Table in Waikīkī. Philimena came to the birthday party, and, at one point, both Chong and Philimena went to the bathroom. Chong testified that Philimena "kind of like put her head down and she says ... her words were, 'That damn Danny pulled my ponytail and punched me in the head,' and she had a quarter size bruise on her forehead." Chong was approximately one or one-and-a-half feet from Philimena at the time. Defense counsel objected to the introduction of this testimony. Chong testified that Philimena said she had just gotten back from Maui, and Chong assumed that Danny had hit her before Philimena went to Maui.

Ronald Akina knew the Hailis since 1985. Akina would see the Hailis often at Biggie's Nutshell (Biggie's), a bar in Kailua. He testified that everyone in Biggie's thought that the Hailis were a perfect couple, but that Philimena told him (Akina) that she had to pretend to enjoy herself while they were out.

Akina testified that he and Philimena talked to each other, but that the two of them did not have sexual relations. Akina testified that Philimena told him that Danny had threatened to kill her "a lot of times." Akina testified that Danny was very controlling of Philimena. In March of 1996, Akina went with Philimena to Maui for two or three days because Philimena was afraid that Danny would kill her if she went home. While on Maui, Philimena told Akina she did not want to return to Kailua; Akina convinced Philimena to return home, however. He testified as follows: "I told her that I don't think Danny was that type of guy. She said, you don't know him like I know him. And I said no, if he wanted to do it, he would have done it already." Akina testified that he did not see any bruises on Philimena's arms or forehead during that trip to Maui.

Akina testified that he spoke with Philimena several times after returning from Maui. Approximately one week after returning from Maui, Philimena called Akina and told him that Danny wanted to meet with both her and Akina at Smitty's in Kailua; Akina testified that he was afraid to meet with Danny, but agreed to the meeting. They met on March 16, 1996. When they met, Philimena told Danny that she loved Akina. Akina thought that she meant "love" in a platonic way, but then realized that Danny interpreted this to mean romantic love. Akina testified that Danny then said if she left him for Akina he would kill both Philimena and Akina. Akina testified that Philimena then told Danny that she did not want to leave Danny, but that she wanted Danny to let her drink when she wanted and to join her girlfriends when she wanted. Danny agreed to this and also agreed that Philimena could see Akina once a week on her day off as long as Danny's friends did not see them together.

That evening (the same day they met at Smitty's), Danny, Akina, and Philimena met at Fisherman's Wharf for dinner and drinks. While at Fisherman's Wharf, Danny "false-cracked" Akina by punching Akina in the jaw. The police arrived and took Danny out; the record is unclear as to whether Danny was arrested. Philimena told Akina she did not want to go with Danny; Akina testified that he told her to "just get away already" and that Philimena went with Akina. Either that evening or the next day, Danny called Akina to apologize.

Akina testified that he and Philimena went to Maui together between three and five times after March 16, just for day trips. Their last trip to Maui was a few days before

she was killed. Akina testified that Philimena told him that she and Danny were fighting and that Danny threatened to kill her again. Akina also testified that Philimena told him that Danny was having a lot of sexual relations with her and that she did not want this. Akina went to Idaho to get away and let Philimena and Danny work things out. He spoke to Philimena from Idaho the night she was killed. He testified that "everything sounded real good" and that he thought everything was all right. He said that he could hear Danny on the phone and that Danny told Philimena to say hello to Akina.

Nanci Kriedman, director of the Domestic Violence Clearinghouse and Legal Hotline, was the final prosecution witness. Over defense counsel's objection, Kriedman was qualified as an expert in the area of domestic violence. She discussed the tactics and behaviors that an abuser in a domestic violence situation uses to maintain power and control over another person. At the close of Kriedman's testimony, defense counsel moved for a mistrial, arguing that Kriedman gave the prosecution's closing argument from the stand.

### B. *Procedural Background*

On June 18, 1996, Danny was charged by complaint with murder in the second degree. He was tried by a jury in November and December 1998. The jury deliberated for a day and a half and declared that it could not reach a unanimous verdict, and the circuit court declared a mistrial.

On January 18, 1999, Danny filed a motion to dismiss the complaint on double jeopardy grounds. He argued that there was no "manifest necessity" for the declaration of a mistrial such that double jeopardy barred a retrial. Judge Wendell Huddy denied Danny's motion on the grounds that the jury was deadlocked, that the jury declared that additional time would not change the deadlock, and that there was manifest necessity to declare a mistrial. Danny's counsel did not approve as to form the findings of fact and conclusions of law issued by the court in Danny's first trial. On March 3, 1999, Danny appealed this denial of dismissal to this court.

On December 22, 1999 (filed 12/27/99), this court issued a Summary Disposition Order affirming the circuit court's denial of dismissal. This court held that there was manifest necessity for the mistrial. Specifically, this court held:

> The trial court did not abuse its discretion in: 1) refusing to provide further definitions of "extreme" in "extreme mental or emotional disturbance" and "normal self-control;" [sic] 2) refusing to give the jury a "mild *Allen* charge;" *see State v. Fajardo,* 67 Haw. 593, 602, 699 P.2d 20, 25 (1985); and 3) accepting the juror's decision that further time would not help it reach a unanimous verdict; *see State v. Minn,* 79 Hawai'i 461, 466, 903 P.2d 1282, 1287 (1995). In addition, this court does not have jurisdiction to review Haili's point of error regarding the trial court's admission of certain hearsay statements. HRS § 641-17 (1993).

*State v. Haili,* No. 22311, 92 Hawai'i 634, 994 P.2d 566 (Haw. Dec.22, 1999) (SDO).

Danny was tried before a jury a second time in October 2000. He did not testify in his own defense.

The circuit court gave a number of limiting instructions during the course of the trial. For example, on the second day of trial, the court instructed the jury on prior bad acts as follows:

> Again, I'm instructing you as follows. During this trial, you have heard and will hear evidence that the defendant is alleged to have engaged in other acts relating to Philimena Haili. You cannot and must not use this evidence to determine that the defendant is a person of bad character, and therefore must have committed the offense charged in this case. Such evidence may be considered by you only on the issues of defendant's state of mind and as to the state of defendant's relationship with Philimena Haili.

On the fourth day of trial, the court instructed the jurors that they could use evidence of Danny's other acts only for Danny's state of mind and for the state of Danny's relationship with Philimena, not to determine that Danny is a person of bad character; the

court gave the same instruction just before closing arguments.

During the settling of jury instructions, defense counsel noted that the jury foreperson, Denise Yoshida (Ms. Yoshida), was the wife of former Deputy Prosecuting Attorney Randal Yoshida (Mr. Yoshida). Defense counsel asked the court to voir dire Ms. Yoshida to determine whether "this particular aspect of [Mr. Yoshida's] history and career causes her any concern about being a fair and impartial juror in this case." The court declined to conduct a separate voir dire. The court noted that "Ms. Yoshida clearly noted her name on the [juror] card as last name Yoshida, the name of her husband Randal Yoshida, and the fact that Mr. Yoshida was a self-employed attorney.... She also marked on the card that she is related [to] or close friends with a law enforcement officer." The court also pointed out that Ms. Yoshida was one of the first twelve jurors into the jury box, such that she was available through the entire voir dire process. The court ruled that the defense had a full opportunity to question and/or challenge Ms. Yoshida, but that defense counsel instead passed her for cause. In denying defense counsel's request to separately voir dire Ms. Yoshida, the court stated:

> There's nothing on the record to suggest that Ms. Yoshida cannot be fair and impartial in this case. The fact that she happens to be married to Mr. Yoshida, who no longer works for the prosecutor's office and has not worked there for quite a while, without more[,] is insufficient. The request is denied.

The jury deliberated for four days and returned a verdict of guilty of second degree murder. On January 2, 2001, Danny was sentenced to incarceration for life with the possibility of parole, subject to a mandatory minimum of fifteen years; he was also ordered to pay $4,000 restitution and a $300 crime victim compensation fee.

On January 31, 2001, Danny again appealed to this court.

## II. STANDARDS OF REVIEW

### A. *Admission of hearsay testimony*

**1. Admissibility for purposes of the hearsay rules**

Where the admissibility of evidence is determined by application of the hearsay rules, the appropriate standard of review is the right/wrong standard. *State v. Moore*, 82 Hawai'i 202, 217, 921 P.2d 122, 137 (1996). Under a right/wrong standard, courts will review the trial court's decision *de novo*, examining the factors and answering the question "without being required to give any weight to the trial court's answer to it." *State v. Kapiko*, 88 Hawai'i 396, 401, 967 P.2d 228, 233 (1998) (citations and internal quotation signals omitted).

However, some decisions regarding the admissibility of hearsay are subject to review under the abuse of discretion standard, rather than the right/wrong standard. For example, in *State v. Christian*, 88 Hawai'i 407, 418, 967 P.2d 239, 250 (1998), this court applied the abuse of discretion standard to review the circuit court's determination that evidence was untrustworthy (and therefore inadmissible) under Hawai'i Rules of Evidence (HRE) Rule 804(b)(3) (1993 & Supp.2002) [9]: "inasmuch as the trial court is

---

9. HRE Rule 804 provides in relevant part:
 **Hearsay exceptions; declarant unavailable.** (a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant:
 . . . .
 (4) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity. . . .
 (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 . . . .
 (3) Statement against interest. A statement which was at the time of its making so far

contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement;
 . . . .
 (5) Statement of recent perception. A statement, not in response to the instigation of a person

required to make a 'judgment call' in determining whether to admit evidence under HRE Rule 804(b)(3), its ruling should not be reversed unless there has been an abuse of discretion." Similarly, this court will review the circuit court's determination of trustworthiness under HRE Rules 804(b)(5) and 804(b)(8) for an abuse of discretion.

 Even if the trial court erred in admitting evidence, a defendant's conviction will not be overturned if the error was harmless beyond a reasonable doubt:

> [T]he error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

*State v. Heard*, 64 Haw. 193, 194, 638 P.2d 307, 308 (1981).

### 2. Admissibility under the confrontation clause

 Evidence may be admissible pursuant to the hearsay rules and yet violate a defendant's constitutional right to confront adverse witnesses. *State v. McGriff*, 76 Hawai'i 148, 156, 871 P.2d 782, 790 (1994); *United States v. Mokol*, 939 F.2d 436, 439 (7th Cir.1991).

 Hearsay evidence must meet one of the following two requirements in order to be admissible pursuant to HRE Rule 804(b) (declarant unavailable): (1) the statement must fall within a firmly rooted hearsay exception;

engaged in investigating, litigating, or settling a claim, which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which the declarant was interested, and while the declarant's recollection was clear;

 . . . .

(8) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (B) the general

or (2) the statement must show particularized guarantees of trustworthiness. *State v. Sua*, 92 Hawai'i 61, 71, 987 P.2d 959, 969–70 (1999). Whether a statement falls within a firmly rooted hearsay exception is a question of law reviewed *de novo*. *Id.* at 68–69, 987 P.2d at 966. Whether a statement has particular guarantees of trustworthiness is reviewed for an abuse of discretion. *Id.* at 68–69, 987 P.2d at 966–67; *State v. Swier*, 66 Haw. 448, 450, 666 P.2d 169, 170 (1983).

### B. *Juror voir dire*

 The circuit court's decision not to question a juror is reviewed for an abuse of discretion:

> Once there is a claim that an accused is being denied his or her right to a fair trial because of outside influences infecting a jury, the initial step for the trial court to take
>
> . . . is to determine whether the nature of the [outside influence] rises to the level of being substantially prejudicial. "If it does not rise to such a level, the trial court is under no duty to interrogate the jury. . . . And whether it does rise to the level of substantial prejudice . . . is ordinarily a question 'committed to the trial court's discretion. . . .' "

*State v. Williamson*, 72 Haw. 97, 102, 807 P.2d 593, 596 (1991) (quoting *State v. Keliihololokai*, 58 Haw. 356, 359, 569 P.2d 891, 895 (1977)) (alterations in original) (citations omitted). "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Lagat*, 97 Ha-

purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Prior to 2002, Rule 804(b)(8) was codified as Rule 804(b)(7); in 2002, the rule was amended and the numbering shifted, but the text of the rule did not change.

wai'i 492, 495, 40 P.3d 894, 897 (2002) (citations and internal quotation signals omitted).

## C. *Jury instructions and response to jury communications*

"The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *State v. Balanza*, 93 Hawai'i 279, 283, 1 P.3d ·281, 285 (2000) (citations and internal quotation signals omitted).

"[T]he circuit court's response to a jury communication is the functional equivalent of an instruction." *State v. Uyesugi*, 100 Hawai'i 442, 458, 60 P.3d 843, 859 (2002) (citations and internal quotation signals omitted).

## D. *Admission of testimony regarding other guns*

[D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

*Kealoha v. County of Hawai'i*, 74 Haw. 308, 319–20, 844 P.2d 670, 676 (1993).

■■■ A trial court's determination of relevance pursuant to HRE Rule 401 (1993)[10] can produce only one correct result and is therefore reviewable under the right/wrong standard. *Kealoha*, 74 Haw. at 314–15, 844 P.2d at 674. However, "the determination of

the admissibility of relevant evidence under HRE 403 [ (1993)[11]] is eminently suited to the trial court's exercise of its discretion because it requires a 'cost-benefit calculus' and a 'delicate balance between probative value and prejudicial effect[.]' " *Id.* at 315, 844 P.2d at 674 (citations omitted) (second alteration in original).

## III. DISCUSSION

### A. *Admission of hearsay testimony*

Danny argues that the circuit court erred by admitting hearsay testimony in violation of HRE Rule 804(b)(5) and the confrontation clauses of the United States and Hawai'i Constitutions. Although the circuit court ruled correctly in admitting this testimony for purposes of the hearsay rules, the court erred in admitting the testimony in violation of Danny's constitutional right to confront adverse witnesses. This error was not harmless beyond a reasonable doubt.

Danny objects to the admission of the following: (1) Carolyn Chong's testimony that Philimena showed Chong a bruise on her head and that Philimena said, "That damn Danny pulled my ponytail and punched me in the head"; (2) Bernadette Lavea's testimony from Danny's first trial, read to the jury during the second trial, in which Lavea testified that Philimena told her that Danny was abusing her; (3) Mary Pasco's testimony from Danny's first trial, read to the jury during the second trial, in which Pasco testified that Philimena had bruises on her arms and told Pasco that Danny was abusing her; (4) Leonora Kaonohi's testimony that Philimena told her that Danny was threatening to kill Philimena; (5) Ron Akina's testimony that Philimena told him that Danny was threatening to kill her and that Danny was forcing Philimena to have sex.[12]

---

10. HRE Rule 401 provides:
 **DEFINITION OF "RELEVANT EVIDENCE"**
 "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

11. HRE Rule 403 provides:
 **EXCLUSION OF RELEVANT EVIDENCE ON GROUNDS OF PREJUDICE, CONFUSION, OR WASTE OF TIME**
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

12. These latter two items constitute hearsay within hearsay; however, "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements

On October 17, 2000, Judge Ahn heard the parties' motions in limine regarding the hearsay testimony. Defense counsel argued that admission of this testimony would violate Danny's constitutional right to confront adverse witnesses. Defense counsel noted that HRE Rule 804(b)(5) is not part of the Federal Rules of Evidence and is not a "traditionally and clearly rooted hearsay exception." Since HRE Rule 804(b)(5) is not a traditionally rooted hearsay exception, defense counsel contended, hearsay testimony should not be admitted under this rule unless the hearsay statements are particularly trustworthy. Defense counsel argued that there was no guarantee of trustworthiness in any of these statements.

The prosecution argued that all the hearsay statements were admissible because they were relevant, necessary, and limited in scope: the statements were made by Philimena within six months of the shooting, and the testimony was necessary to counter Danny's contention that the shooting was a result of EMED.

The circuit court concluded that the statements were admissible. First, the court deemed these statements to be trustworthy: the court noted that Philimena probably would not have told Akina about the death threats if her intent was to convince Akina to stay, because hearing this kind of statement could have made Akina flee; the court also rejected defense counsel's contention that Philimena was making these statements to garner support and sympathy for a possible divorce, noting that Philimena never actually left Danny. Second, the court ruled that these statements were "relevant to the nature of [Danny's] relationship with [his] wife, which is the basis for [Danny's] professed state of mind." Third, the court noted that the declarant (Philimena) was unavailable. Fourth, the court ruled that there was a substantial need for the evidence to rebut Danny's contentions regarding his state of mind. Therefore, the court ruled that these statements were admissible pursuant to

HRE Rule 804(b)(5) and the "catchall" hearsay exception (now Rule 804(b)(8), then Rule 804(b)(7)). The court also ruled that the evidence was more probative than prejudicial, but limited the admission of hearsay evidence to those acts which occurred close to the date of the shooting.

### 1. Rule 804(b)(5)'s application to criminal cases

Danny argues on appeal that HRE Rule 804(b)(5) should not apply in criminal cases generally and, therefore, should not apply in this case. However, regardless of whether the evidence is admissible pursuant to Rule 804(b)(5), the evidence is still admissible under the "catchall" exception in Rule 804(b)(8). This court has applied the catchall exception in criminal cases. *See, e.g., State v. Swier,* 66 Haw. 448, 449–50, 666 P.2d 169, 170 (1983) (excluding hearsay testimony as being untrustworthy under the second prong of the catchall exception). The issue, as discussed more fully *infra,* is whether the proffered hearsay testimony was "trustworthy": if the testimony was trustworthy, then it was admissible under the catchall exception.

### 2. Rule 804(b)(5): "In contemplation of pending or anticipated litigation"

Danny argues that the hearsay statements at issue were inadmissible because Philimena made them in anticipation of divorce proceedings; divorce is litigation, Danny notes, such that Philimena's statements should be inadmissible under the terms of HRE Rule 804(b)(5). Danny is incorrect that the statements are inadmissible.

First, Philimena's statements are admissible under HRE Rule 804(b)(8) even if—for the sake of argument—inadmissible under HRE Rule 804(b)(5). There is no exception under HRE Rule 804(b)(8) for pending or anticipated litigation, so the state-

conforms with an exception to the hearsay rule." HRE Rule 805. The first part of each combined statement, in which Danny threatened Philimena, is an admission by a party-opponent and is therefore admissible pursuant to HRE Rule

803(a)(1)(A). Accordingly, the issue regarding these items is whether *Philimena's* statements fall within a recognized hearsay exception. *See* discussion *infra.*

ments would be admissible even if divorce proceedings were actually underway.

 Second, even if the circuit court had admitted the evidence pursuant to HRE Rule 804(b)(5) only (rather than under HRE Rules 804(b)(5) and 804(b)(8)), Danny's argument is far too broad. Particularly in the case of divorce, a spouse must take substantial steps towards court action before the exception applies. While we agree that notifying one's spouse that one intends to file for divorce is a substantial step towards the break-up of a relationship, it often appears (as occurred here) that the spouse may contemplate divorce for a long time before proceeding (if s/he proceeds at all).

Other state courts have similarly declined to construe the "pending or anticipated litigation" exception broadly. For example, in *State v. Ross*, 122 N.M. 15, 919 P.2d 1080 (1996), the New Mexico Supreme Court held that the "pending or anticipated litigation" exception did not apply to hearsay statements made by a woman killed by her ex-husband, even though the woman was planning to obtain a restraining order against the husband. *Ross*, 919 P.2d at 1086 ("Assuming that it was in fact [the woman's] intent to get a restraining order, the record does not support an inference that [she] made these statements in order to facilitate that process. Instead, the evidence indicates that [she] made all of the disputed statements out of concern for her own welfare."). The New Mexico Supreme Court noted, however, that its counterpart to HRE Rule 804(b)(5) had since been repealed; it also noted that the woman's communications were all made during conversations initiated by another person (*i.e.*, the woman did not make unsolicited comments regarding her relationship with the defendant). *Id.*

In the instant case, the prosecution notes that all the people to whom Philimena made these statements were people who would have been on Philimena's side anyway: close friends and co-workers. Like the victim in *State v. Ross*, Philimena seems to have made these statements out of concern for her own welfare rather than to bolster a nonexistent divorce case. Therefore, we reject Danny's argument that Philimena's statements are

inadmissible because they were made in contemplation of future divorce litigation.

### 3. Admissibility of hearsay testimony

Danny also argues that even if HRE Rules 804(b)(5) and 804(b)(8) apply in this case, Philimena's statements still constitute inadmissible hearsay.

 The circuit court found the hearsay statements to be trustworthy and therefore permitted testimony regarding them at trial. We review this determination for an abuse of discretion. *See State v. Christian*, 88 Hawai'i 407, 418, 967 P.2d 239, 250 (1998). In determining the hearsay statements to be trustworthy, the circuit court did not abuse its discretion: as already noted, the circuit court analyzed Philimena's statements and determined that they were trustworthy, relevant, and necessary. The court did not clearly exceed the bounds of reason in balancing the factors for and against trustworthiness for the purposes of hearsay admissibility. As discussed *infra*, however, the circuit court did abuse its discretion in admitting these statements in violation of Danny's right to cross-examine adverse witnesses.

### 4. Confrontation clause

Danny next argues that admission of the foregoing hearsay testimony violated his constitutional right to confront and cross-examine witnesses. We agree.

 Article I, section 14 of the Hawai'i Constitution and the sixth amendment to the United States Constitution guarantee criminal defendants the right to confront and cross-examine adverse witnesses. *State v. Moore*, 82 Hawai'i 202, 222, 921 P.2d 122, 142 (1996). However, this right is not absolute: the prosecution may present hearsay testimony adverse to the defendant in certain circumstances, because of the "societal interest in accurate factfinding, which may require consideration of out-of-court statements." *State v. McGriff*, 76 Hawai'i 148, 156, 871 P.2d 782, 790 (1994) (quoting *Bourjaily v. United States*, 483 U.S. 171, 182, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)) (block quote format omitted). In *State v. Sua*, 92

Hawai'i 61, 987 P.2d 959 (1999), this court reiterated that hearsay testimony must meet a two-part test so as not to violate a defendant's constitutional rights:

> This court has repeatedly followed the test established in [*Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) ], recognizing that
>
> > the confrontation clause restricts the range of admissible hearsay in two ways. First, the prosecution must either produce, or demonstrate the unavailability of, a declarant whose statement it wishes to use against a defendant. Second, upon a showing that the witness is unavailable, only statements that bear adequate indicia of reliability are admissible.

*Sua*, 92 Hawai'i at 71, 987 P.2d at 969 (quoting *State v. Ortiz*, 74 Haw. 343, 361, 845 P.2d 547, 555–56 (1993)). All of the hearsay statements made by Philimena obviously satisfy the first prong of this test. However, as discussed below, the statements do not bear adequate indicia of reliability.

### a. *Adequate indicia of reliability*

In *Idaho v. Wright*, 497 U.S. 805, 816–17, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), the United States Supreme Court held that the prosecution must demonstrate the reliability of hearsay testimony by proving either: (1) that the proffered hearsay testimony is within a traditionally rooted hearsay exception; or (2) that the proffered hearsay testimony has particular guarantees of trustworthiness. The hearsay testimony in the instant case does not satisfy this test.

### i. Traditionally rooted hearsay exception

▮▮▮▮ Neither HRE Rule 804(b)(5) nor HRE Rule 804(b)(8) is a traditionally rooted hearsay exception. HRE Rule 804(b)(5) does not have a counterpart in the Federal Rules of Evidence and is not widely accepted. *State v. Ross*, 122 N.M. 15, 919 P.2d 1080, 1086–87 (1996). HRE Rule 804(b)(8) is like-

wise not a firmly rooted hearsay exception. *See Wright*, 497 U.S. at 817, 110 S.Ct. 3139 (holding that Idaho's residual hearsay exception, Idaho Rules of Evidence (IRE) Rule 803(24),[13] was not a firmly rooted hearsay exception). The United States Supreme Court explained:

> Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements. The residual hearsay exception, by contrast, accommodates ad hoc instances in which statements not otherwise falling within a recognized hearsay exception might nevertheless be sufficiently reliable to be admissible at trial.

*Wright*, 497 U.S. at 817, 110 S.Ct. 3139 (citations omitted).

### ii. Particular guarantees of trustworthiness

The United States Supreme Court held that particular guarantees of trustworthiness should be judged by examining the totality of the circumstances surrounding each of the proffered hearsay statements. *Wright*, 497 U.S. at 819, 110 S.Ct. 3139. However, both this court and the United States Supreme Court have held that courts may not rely upon corroborating evidence from other parts of the trial to support a finding of trustworthiness. *Wright*, 497 U.S. at 822–23, 110 S.Ct. 3139; *Sua*, 92 Hawai'i at 72 n. 5, 987 P.2d at 970 n. 5. The United States Supreme Court rejected a mechanical test for determining whether a statement is trustworthy, instead noting that trustworthiness is inversely related to the usefulness of cross-examination: "if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." *Wright*, 497 U.S. at 820–22, 110 S.Ct. 3139. Simply because evidence is admissible under the catchall rule does not

---

13. IRE Rule 803(24) is substantially similar to HRE Rule 803(b)(24); like HRE Rule 804(b)(8), IRE Rule 803(24) and HRE Rule 803(b)(24) also provide a catchall exception to the hearsay exclu-

sion. The difference is that Rule 804 is applied where the declarant is unavailable and Rule 803 is applied if the declarant is available.

mean that the evidence is trustworthy enough to satisfy the confrontation clause. *United States v. Mokol*, 939 F.2d 436, 439 (7th Cir.1991). However, the United States Supreme Court has sought to construe the confrontation clause pragmatically, recognizing that "every jurisdiction has a strong interest in effective law enforcement." *Ohio v. Roberts*, 448 U.S. 56, 64, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). *See also Sua*, 92 Hawaiʻi at 63, 74, 987 P.2d at 961, 972 (admitting hearsay testimony under the past recollection recorded exception and noting that the testimony was reliable because: (1) the declarant had given the testimony under oath; (2) as the victim, the declarant had personal knowledge of relevant facts; (3) the declarant was not reluctant to implicate the defendant during the grand jury proceedings; (4) the declarant did not have a relationship with the government, such that he would not have benefitted from fabricating testimony implicating the defendant; and (5) the declarant never recanted his testimony).

Examining the totality of circumstances in the instant case does not yield a clear result. The statements appear trustworthy because Philimena never recanted her statements and made them to individuals who probably would have supported Philimena's decision to divorce Danny regardless of the existence of abuse. However, none of Philimena's statements was made under oath, and Philimena could have benefitted from these statements by garnering sympathy and support from her friends and family.

█ We hold that the circuit court erred in admitting Philimena's statements to Akina, Lavea, and Kaonohi that Danny was threatening to kill her. The court also erred in admitting Philimena's statements to Pasco and Chong that Danny was abusing her.

█ To be admissible, the court must have some reason to believe that the declarant's hearsay statements are particularly trustworthy. *See, e.g., United States v. Doerr*, 886 F.2d 944, 955–56 (7th Cir.1989) (witness's grand jury testimony sufficiently trustworthy where testimony was given un-

der oath subject to penalty for perjury; witness had been explicitly informed that he had a constitutional right not to answer any questions and witness was not pressured to testify); *Steinberg v. Obstetrics–Gynecological & Infertility Group, P.C.*, 260 F.Supp.2d 492, 496 (D.Conn.2003) (hearsay within hearsay statements in letter from plaintiff's former attorney to plaintiff's current attorney were admissible under residual exception to hearsay rule because there was "no reason why [the former attorney] would have been motivated to fabricate or convey any inaccurate information to [the current attorney]"). But because we cannot rely upon corroborating circumstances to justify admission of the testimony, we cannot consider the fact that Danny actually did kill Philimena in determining whether her recitation of threats was particularly trustworthy. Similarly, we cannot utilize the fact that Philimena told several individuals, at different times, that her life was in danger to bootstrap the admission of all these statements. Each statement must be independently trustworthy without regard to other supporting statements. In the instant case, there is nothing intrinsic to Philimena's statements to uphold the circuit court's determination that they were particularly trustworthy. The statements were not made under oath; they were not made to law enforcement personnel; they were not made to an attorney or other officer of the courts; they were not made to a domestic violence counselor; they were not made to a teacher or employer; and they were not made to a therapist or religious figure.[14] In short, the statements were not made under circumstances demonstrating *particular guarantees* of trustworthiness, which is a stricter standard than the trustworthiness standard for admission under the hearsay rules. Therefore, the circuit court erred in admitting the hearsay testimony.

b. *Harmless beyond a reasonable doubt*

As this court stated in *State v. Peseti*, 101 Hawaiʻi 172, 183, 65 P.3d 119, 130 (2003), "the denial of a defendant's right to confront adverse witnesses is subject to the harmless-

---

14. This certainly is not an exhaustive list of circumstances under which we might find a hear-

say statement to have particular guarantees of trustworthiness.

beyond-a-reasonable-doubt standard of review." *See also Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (holding same).

■ The erroneous admission of evidence that Philimena told others that Danny was threatening her life may have been harmless. Even without admission of this hearsay testimony, the jury still would have heard testimony that Danny had threatened Philimena's life: Akina testified that when he, Danny, and Philimena went to Smitty's in Kailua, Danny threatened to kill both Philimena and Akina if Philimena left Danny for Akina. Akina heard Danny threaten Philimena, and Danny's threat was admissible under HRE Rule 803(a)(1)(A) as an admission by a party-opponent. This evidence, which was properly admitted, may have been sufficient for the jury to conclude that Danny was not under the influence of an EMED (such that the erroneous admission of hearsay testimony might have been harmless beyond a reasonable doubt). *See Wright*, 497 U.S. at 823, 110 S.Ct. 3139 ("[W]e think the presence of corroborating evidence more appropriately indicates that any error in admitting the statement might be harmless, rather than that any basis exists for presuming the declarant to be trustworthy.") (footnote omitted).

However, we cannot say that admission of this evidence was harmless beyond a reasonable doubt. Danny did not dispute that he shot Philimena; the only issue for the jury was his state of mind at the instant he killed her. The hearsay testimony in question went directly to this issue and was intended to rebut Danny's claimed mitigating defense of extreme mental or emotional disturbance. Philimena told three people (Akina, Lavea, and Kaonohi) separately, at different times, that Danny was threatening to kill her. Similarly, Philimena told Pasco and Chong separately that Danny caused her bruises; she also described the way in which Danny caused the bruises. This evidence was not duplicative or cumulative. Rather, each of these items of hearsay testimony was separate, independent evidence supporting the conclusion that Danny was not under the influence of EMED at the time he shot Philimena. "Harmless beyond a reasonable doubt" is a strict standard, and under these circumstances we cannot conclude that denial of Danny's right to confront these adverse witnesses was harmless. We thus hold that Danny is entitled to a new trial as a result of these constitutional violations.

Although this holding is dispositive of this case, we address Danny's remaining points on appeal to provide guidance to the circuit court on retrial.

### B. *Juror voir dire*

■ The circuit court did not abuse its discretion in declining to individually voir dire juror Yoshida at the time the court and counsel were settling jury instructions. As the circuit court noted, juror Yoshida was one of the first twelve jurors in the jury box and was available for examination by defense counsel throughout the voir dire process. The court also noted that juror Yoshida had clearly indicated that her last name was Yoshida and that her husband was an attorney named Randal Yoshida. Juror Yoshida also marked on her juror information card that she was "related [to] or close friends with a law enforcement officer." Defense counsel had every opportunity to examine juror Yoshida during voir dire; he did in fact examine juror Yoshida, and he passed her "for cause." Moreover, defense counsel's belated concern about juror Yoshida at the close of trial is not supported in the record. Defense counsel did not cite to any misconduct by juror Yoshida, and the court found:

> There's nothing on the record to suggest that Ms. Yoshida cannot be fair and impartial in this case. The fact that she happens to be married to Mr. Yoshida, who no longer works for the prosecutor's office and has not worked there for quite a while, without more[,] is insufficient.

Therefore, the court did not abuse its discretion in declining to separately voir dire juror Yoshida at the close of the case after all the evidence had been taken.

### C. *Jury instructions and response to jury communications*

The circuit court instructed the jury on the distinction between second degree murder and EMED manslaughter as follows:

If, and only if, you find beyond a reasonable doubt that the defendant Danny H. Haili committed the offense of Murder in the Second Degree as to Philimena Haili, you must then determine whether at that time he was under the influence of extreme mental or emotional disturbance for which there was a reasonable explanation.

The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances of which he was aware or as he believed them to be.

The prosecution must prove beyond a reasonable doubt that the defendant was not at the time he caused the death of Philimena Haili under the influence of extreme mental or emotional disturbance for which there was a reasonable explanation.

If the prosecution has done so, then you must return a verdict of guilty of Murder in the Second Degree. If the prosecution has not done so, then you must return a verdict of Manslaughter based upon extreme mental or emotional disturbance.

The question of the defendant's self-control or the lack of it at the time of the offense is a significant factor in deciding whether he was under the influence of extreme mental or emotional disturbance.

Danny argues that the circuit court's instructions were prejudicially insufficient and erroneous for three reasons. First, he argues that the circuit court erred in instructing ·the jury that it should consider the EMED issue if, and only if, the jury first found that Danny intentionally or knowingly caused Philimena's death. Danny contends that the instruction should have begun by instructing the jurors that the first question was whether the prosecution proved beyond a reasonable doubt that Danny intentionally and knowingly caused the death of Philimena, and that the second question was whether the prosecution had proved beyond a reasonable doubt that Danny was not under the influence of an EMED. Second, Danny argues that this court was incorrect in *State v. Perez*, 90 Hawai'i 65, 976 P.2d 379 (1999), in which this court held that self-control is a

significant factor in EMED cases. In so holding, this court overruled the ICA; the ICA had held that the question was whether the defendant was influenced by the requisite mental and emotional disturbance, not whether the defendant had the proper self-control at the time of the act in question. *Perez*, 90 Hawai'i at 72, 976 P.2d at 386. Third, Danny argues that the circuit court erred in refusing to define "self-control" or "extreme mental or emotional disturbance" in its instructions to the jury. Defense counsel made timely objections on all three points.

### 1. Instructions. regarding order of findings

Danny first argues that the jury instructions were erroneous because the court misstated the order in which the jury should have considered the issues. The court instructed jurors to examine the EMED issue if, and only if, they found beyond a reasonable doubt that Danny committed the offense of second degree murder. Danny argues that the prosecution's disproving of the EMED defense must come first—that the prosecution must prove that Danny was not under the influence of an EMED *before* the jury could conclude that Danny was guilty of second degree murder. Danny, however, cites no legal authority for this proposition.

In *Perez*, this court upheld an instruction virtually identical to that at issue here.[15] 90 Hawai'i at 68, 76, 976 P.2d at 382, 390. Pursuant to these instructions, the prosecution still has the burden of proving every element of the alleged crime beyond a reasonable doubt—regardless of the order in which the jury is instructed to examine the issues. Danny has failed to demonstrate any prejudice.

### 2. *Perez* instructions regarding self-control

Danny asks this court to overrule *Perez*, a unanimous opinion of this court issued less than five years ago. We decline to do so. In *Perez*, we analyzed HRS § 707–

---

15. . The only difference was that the defendant in *Perez* was charged with attempted murder in the

second degree, rather than murder in the second degree. *Perez*, 90 Hawai'i at 68, 976 P.2d at 382.

702(2) (1993) [16] and applicable case law and concluded that "[i]t is insufficient for a criminal defendant merely to allege that he or she was experiencing emotional distress at the time of the charged offense." *Perez*, 90 Hawai'i at 74, 976 P.2d at 388. *See also State v. Matias*, 74 Haw. 197, 206, 840 P.2d 374, 378 (1992) ("Based on the foregoing clear authority, [the defendant] is manifestly mistaken in arguing that the question of self-control on the part of the killer is not relevant to the issue of whether a murder should be mitigated to manslaughter under HRS § 707–702(2)."). We held that the key distinction was between the "intentional" or "knowing" character of the defendant's conduct, on the one hand, and the "controllability" of the defendant's conduct, on the other. *Perez*, 90 Hawai'i at 74, 976 P.2d at 388. Self-control is therefore a "significant, even determining, factor in deciding whether the killer was under the influence of an extreme emotional disturbance such that his conduct would fall under HRS § 707–702(2)." *Matias*, 74 Haw. at 204, 840 P.2d at 378. As a result, the circuit court's instructions were not erroneous.

### 3. Refusal to define terms

Danny also argues that the circuit court's instructions were erroneous because they failed to define key terms. When instructing the jury, the court did not define the term "extreme mental or emotional disturbance." During deliberations, the jury sent the court a communication stating that "[t]he jurors would like to know the court's definition of extreme mental or emotional disturbance"; the court responded by stat-

ing, "Please refer to the Court's instructions."

Danny is again incorrect. When considered as a whole, the court's instructions were not prejudicially insufficient, erroneous, inconsistent, or misleading. The Hawai'i Legislature has not defined "extreme mental or emotional disturbance." Accordingly, the circuit courts need not define the term when instructing the jury; instead, the jury is to give the phrase its plain meaning. *See Roxas v. Marcos*, 89 Hawai'i 91, 148, 969 P.2d 1209, 1266 (1998) ("The instructions, as they were actually given to the jury, did not include the legal definitions of 'defraud' or 'deceit.') Accordingly, we presume that the jury applied the commonly understood meaning of those terms" (citing HRS § 1–14 (1993) ("The words of a law are generally to be understood in their most known and usual signification[.]")). *See also United States v. Smith*, 635 F.2d 716, 720 (8th Cir.1980) ("The word 'knowledge' as used in the instruction on the elements of the offense is a word of common usage and thus within the ordinary understanding of a juror. The district court was under no obligation to define words within the ordinary understanding of the jury."); *State v. Williams*, 38 Ohio St.3d 346, 528 N.E.2d 910, 921 n. 14 (1988) ("We emphatically remind trial courts that they should limit definitions, where possible, to those definitions provided by the legislature in order to avoid unnecessary confusion and needless appellate challenges."); *Roise v. State*, 7 S.W.3d 225, 242 (Tex.App.1999) ("If a phrase, term, or word is statutorily defined, the trial court should submit the statutory definition to the jury. . . . Words that are not statutorily defined are to be given their common,

---

16. HRS § 707–702(2) provided:

 (2) In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be.

In 2003, this statute was amended by 2003 Haw. Sess. L. Act 64, § 1 at 115–16. The statute currently reads as follows, with new material underscored and deleted material stricken:

 (2) In a prosecution for murder or ~~attempted~~ murder in the first and second degrees it is ~~a~~ an affirmative defense, which reduces the offense to manslaughter~~,~~ or attempted manslaughter, that the defendant was, at the time ~~he~~ the defendant caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the ~~defendant's situation under the~~ circumstances as ~~he~~ the defendant believed them to be.

ordinary, or usual meaning." (Citations omitted.)). Therefore, the circuit court correctly refused to define "extreme mental or emotional disturbance." *Cf. State v. Seguritan*, 70 Haw. 173, 173–74, 766 P.2d 128, 128–29 (1988) (holding that the circuit court erred in instructing the jury on the definition of EMED because the circuit court used language not found in the statute).

## D. *Admission of evidence*

◼◼◼ The circuit court erred in admitting testimony that Danny possessed guns (two shotguns and a handgun found in Danny's bedroom) other than the gun he used to shoot Philimena. Possession of these guns was not relevant, as there was no connection between the guns and the shooting of Philimena.

## IV. CONCLUSION

Based on the foregoing, we vacate the circuit court's January 2, 2001 judgment of conviction and sentence and remand this case for a new trial.

## Concurring and Dissenting Opinion by ACOBA, J.

I concur in the vacation of the case and the remand for a new trial on the ground that the right of confrontation of Defendant–Appellant Danny H. Haili (Defendant) was violated. I would also hold, however, that the instruction of the first circuit court (the court) to the effect that "[t]he question of the Defendant's self-control, or the lack of it, at the time of the offense, is a significant factor in deciding whether he was under the influence of extreme mental or emotional disturbance[ ]" was error. This court in *State v. Perez*, 90 Hawai'i 65, 976 P.2d 379 (1999) [hereinafter *Perez II* ], reversed in part the Intermediate Court of Appeals in *State v. Perez*, 90 Hawai'i 113, 976 P.2d 427 (Haw.Ct. App.1998) [hereinafter *Perez I* ], *aff'd in part and rev'd in part*, 90 Hawai'i 65, 976 P.2d 379 (1999), on the ground that "it was not error to instruct the jury that self-control was a 'significant' factor in assessing whether the mitigating defense applied" to the defendant, *Perez II*, 90 Hawai'i at 74, 976 P.2d at 388. I must respectfully disagree.

Reviewing prior case law and referring to the commentary on Hawai'i Revised Statutes (HRS) § 707–702, *Perez I* pointed out that "the 'criterion of a general weakening of self-control' seen as 'an advanced and liberal approach for 1853,' was not the same as but rather 'something approximating the Code's already *more general approach to mental and emotional extenuation*.'" *Perez I*, 90 Hawai'i at 123, 976 P.2d at 437 (quoting Commentary on HRS § 707–702) (emphasis in original) (brackets omitted). Thus, "[i]n light of the 'more general approach' of the defense as compared to 'the early criterion of a general weakening of self-control,' ... the language [referring to self-control as a significant factor] ... was conceptually too narrow, and thus insufficient in informing the jury of the role of 'self-control' under the penal code formulation of the defense." *Id.* (brackets omitted). Consequently, as noted in *Perez I*, "[t]he instruction could thus be, and in fact was used by the prosecution in closing argument to unduly limit the scope of the defense." *Id.* Thus, in that case, "the State argued to the jury that if Defendant was capable of committing the acts charged, he possessed sufficient self-control to disqualify him from invoking the emotional disturbance defense[.]" *Id.*

I agree, then, with Defendant's objection to the jury instruction referred to *supra*. As was previously stated in *Perez I*, "an instruction which merely singles out 'self-control' for consideration by the jury is prejudicially insufficient and misleading." *Id.* at 124, 976 P.2d at 438. This is because "the emotional disturbance defense *admits* that the defendant intentionally or knowingly caused the death of another or attempted to do so, and therefore, that the defendant possessed the requisite 'self-control' to commit or attempt murder." *Id.* (emphasis in original). Hence, "[c]ommission of such acts is, in effect, the factual and legal prerequisite for raising such a defense, and thus not the basis for defeating it." *Id.* Therefore, "[t]he question is not whether the defendant had sufficient self-control at the time to commit murder ..., but whether, when the acts were committed, the defendant was *influenced* by the requi-

site mental and emotional disturbance. *Id.* (emphasis in original).

"Self control" is not an element of the defense of emotional disturbance manslaughter. It is not surprising that juries, as did the jury in this case, continue to request further instruction from the trial courts as to the definition of mental and emotional disturbance. The defense becomes logically meaningless because the question of self-control is obviated by the legal prerequisite finding of intentional or knowing conduct resulting in murder that the fact finder must make; a point invariably argued by the prosecution in these cases.